# CIRCUIT COURT OF BALTIMORE CITY.

Filed September 2, 1926.

■■■■—June 24, 1927.

WASHINGTON MOTOR COACH CO., INCORPORATED, A BODY CORPORATE,

VS.

HAROLD E. WEST, EZRA B. WHITMAN AND J. FRANK HARPER, BEING AND CONSTITUTING THE PUBLIC SERVICE COMMISSION OF MARYLAND.

*Clarence W. Miles, Eugene A. Edgett, Ogle Marbury* and *G. W. S. Musgrave* for the complainant.

*Herbert Levy* and *J. Hubner Rice*, Assistant Attorneys-General of State of Maryland.

*Carville D. Benson* and *William L. Rawls* for the respondents, etc.

O'DUNNE, J.—

The first thing, gentlemen, I want to say to you is this, that I thank you, the counsel on both sides, for your industry, ability, and patience, all of which qualities you have exhibited and displayed in the presentation of the questions before the Court.

Needless to say, this line of judicial endeavor is new to me, and therefore, I am deeply grateful to counsel for the patience with which they have presented the questions, and the exhaustive manner in which they have treated them. I have striven to co-operate with

494

you to the extent of giving each side, and every lawyer on each side, full opportunity to be heard as to the result of his examination of the authorities; and I have examined those authorities which you have cited, either after the adjournment of the court the same day, or before your arrival in the morning. This applies, certainly, to all of the cases that came down from the Bar Library. There were a few references made from your notes, or from certain text books which were in the possession of various counsel, which I did not examine, but to the reading of which, I did pay strict attention.

I realize, also, that this case is one which you want to go to the Court of Appeals, and one which should go there in the public interests. Therefore, I feel that no useful purpose could be served in withholding the Court's decision, all the more so, when we take into consideration the limited time yet remaining for the perfection of the record between now and the October term. The only purpose in delaying the decision at this time, would be for some little elaboration of the decision, possibly after a more extended examination of the authorities. What you gentlemen want is *a decision*, and such reasons for the making of that decision, as may be helpful to the losing side in reversing the Court, if the reasons which actuated it to its conclusion are not well-founded.

While I have been admonished that it is always a bad thing for the Court to give a reason for its conclusions, I always feel that the side which is not successful in the contention, should have the benefit of the Court's reasons, if only for the purpose of obtaining a reversal of the Court's decision, if, by chance, that decision has been arrived at by any process of bad reasoning.

First, I think that you may look at the bill from several aspects. Viewed on the theory that it is an invocation of the original jurisdiction, inherent in the Court, to restrain a *threatened* injury to a property right, on that aspect I say the demurrer should be sustained, on the ground that there is no right here *in operation*, the threatened injury to which could be enjoined, because, until there is an *intrastate* business *actually in operation*, and until some threatenings of rights acquired thereby should actually occur, the Court is without power to act. There is no jurisdiction

in the Court merely to restrain a *contemplated* injury, or a *suspected* injury, which may occur to a business, the carrying out of which is now but an idea *projected;* and therefore, before that question, it seems to me, can even arise, it would certainly seem that you would have to have in operation an intrastate business, and then there could be a legal theory for a successful enjoining of those who might seek to invade those rights, or threaten injury where legal rights exist.

Second. Viewing the bill from the aspect of the ninth paragraph, viz., that because the complainant company is engaged in interstate commerce, it is not within the scope of the government of the State of Maryland to interfere with its operations, by restraining it from engaging, as well, in intrastate business, I think that the demurrer should be sustained as a legal condition not well-founded.

On the question of the special demurrer, filed on the first day of this argument which has now consumed some three full days, that demurrer to the ninth paragraph will be formally sustained.

I would also state, for the purposes of the record, that the general demurrer, filed about a month ago to the entire bill, and which was overruled at that time, was limited in the argument which took place at that stage of the case, exclusively to the question of the discussion of the multifarious character of the bill, and none of the various grounds of demurrer that have been presented here at this hearing, Tuesday, Wednesday, and today, were even suggested at that time.

So that disposes of the bill viewed from two aspects, as to the original invocation of a hearing upon a petition filed in the Equity Court, as on the theory of the ninth paragraph.

Now, looked at from the ground of purely statutory jurisdiction:

Viewing the bill from the statutory ground, which is Sections 43 and 44 of the Public Service law (otherwise referred to by Mr. Marbury, as.404 and 405, of Article 23), this occurs to me as a proper statement. If the present jurisdiction is to be maintained, it must be under the wording in that Act, as to statutory jurisdiction, and, as such, it must be strictly adhered to. That brings me to the argument that Mr. Rawls made yesterday, on the invita-

tion of the Court and for which the Court is profoundly grateful. We must not overlook in the interpretation of that statute, the canon of interpretation that it should be construed constitutionally, for, if you treat it in one way it is not constitutional. It is not constitutional, in my judgment, if you treat it as giving to this Court the ultimate authority, in the last analysis, to either *issue* the permit, or the franchise itself, or to *order* the Commission to issue it. If so construed, that would mean, placing upon the statute such a construction as would assume that the Legislature has vested in the *judicial* branch of our government an ultimate exercise of something that is exclusively, a legislative function.

It is a fundamental principle of our government, found in Article Eight of the Maryland Declaration of Rights, that the three branches of government must be kept separate, in so far as the exercise of their functions is concerned. That wording of the principle is found, substantially the same, in the earlier constitutions, and is found set forth, perhaps, even more *emphatically*, in the Constitution of '51, when the original provision was followed by the additional language, that no duty should be exercised or assumed by one branch of this government that belonged to another branch of the government. These may not be the exact words, but that is the idea. So, ever since the Constitution of '51, there has been this expression in our law, that one branch of our government shall not assume or exercise the function that may lie within the department of another.

As Mr. Rawls said yesterday, if this section was to be construed as giving *statutory* authority for the equity court to assume to substitute its *"judicial mind"* for the *"legislative mind"* of the Commission, a Commission that has been vested by the Legislature with the delegated powers of legislative discretion (to wit: The Public Service Commission), then conflict of departments arise if the legislative commission should think otherwise than the Court, for then there would have to be in the statute a constitutional and separate authority vested in the Court to enforce its judicial determination of the question over the discretionary exercise of the delegated authority by the legislative sub-department of the government. Such interpretation would make Section 44 unconstitutional, as vesting in a judicial branch, legislative functions.

The principle as to the separation of the three branches of our government being preserved, has been very jealously guarded in the State of Maryland from the earliest days; not only in its Constitution, but also in the decisions of its courts. I think the leading case in Maryland—or probably, the leading case, is in 4th Gill & Johnson, 463, the case of Crane vs. Meginnis; although the same principle had but shortly before been decided in Stall vs. Chase, 5th Harris & Johnson, 297; and has also been maintained from that time down through other decisions, and, more recently, by, our Courts of Appeals in its decision in the case of Robey vs. The County Commissioners of Prince George's County, in 92 Maryland, 150; and in the case of Harris vs. The County Commissioners of Allegany County, 130th Maryland, page 488; where that principle of the forever separate exercise of the departmental division of authority was laid down as something that was to be always preserved, and the violation of which was designated as being repugnant to, and in violation of, the Constitution of the State.

Therefore, you must give to this Section 43 and 44 (otherwise called 404 and 405, of Article 23), that construction, which will not either impinge upon Article Eight, or, as Mr. Rawls so well said yesterday, even involve serious doubt.

Now, taking Section 43 up for analysis, and undertaking to see what it evidently means, banishing the thought that it was ever the intention of the Legislature to do anything unconstitutional, or to give any jurisdiction to a court which is not within its constitutional jurisdiction, namely, not to attempt to delegate to any judicial branch of the government any exclusively legislative function; it seems to me that you can regard the section as an attempt on the part of the Legislature, to safeguard *"legal"* rights, where they may exist, and to give them the adequate and proper protection of judicial review. But, where the matter involved is not either a *"property,"* or a *"personal"* right, where it is a matter of grace, where it is within legislative discretion to grant or not to grant, that deals not with *"rights"* but with legislative bounty. There are no *"rights"* in the premises before us at all. Therefore, there is no subject matter—as Mr. Rawls and Senator Benson said, on

the first day of the argument—there is no subject matter that would be entitled to be protected by judicial review; because, the granting of a franchise is not a matter of right to any applicant or beneficiary, and therefore, not one which can invoke the aid of a *judicial* tribunal for its protection. After the *right* has been granted, the franchise extended. and the industry started, whatever it may be, then *judicial* aid may be sought in the protection of rights acquired.

Now, taking another view, another angle for analysis, of Section 43. Undoubtedly, the wording of the things enumerated there as matters to be appealed from, do vest the judicial branch of the government with power to act. It sets out that if any person in interest feels aggrieved, or feels that the action of the Commission has been either unlawful, arbitrary, or unreasonable, necessarily assuming, as I think, that his *rights* have thereby been affected, a judicial review is provided.

For instance, if the Commission has fixed any rate or rates, tolls, charges, schedules, and so on at such a figure that any party feels aggrieved thereby, and thinks that his *rights* have been affected to his injury, he has a right to appeal to the courts for protection. If he has *legal rights* which have been taken from him without just or due process of law, he has a right to appeal. He may say that he has been discriminated against, for this reason or for that, by the Commission. Suppose they did. The first question is, are his *rights* affected thereby? The discrimination may not have been highly moral, and it may not have been highly ethical, but if his legal *rights* have not been affected, then he has no right to judicial protection.

Therefore, in this case, as applied to the granting of franchise, as distinguished from all other things mentioned in here, if we try to interpret the Act to mean that where anybody, having been aggrieved because the Commission denied the franchise, which denial is an exercise of a legislative function. that he may file an appeal in the Equity Court, complaining of the unreasonable and arbitrary character of the Commissioners' conduct. and have it nullified, because it was an arbitrary exercise of authority, why then, as Mr. Rawls said yesterday, you are attempting to substitute the

*judicial discretion* for the *legislative discretion* as the controlling authority.

The two questions that come before me and on which I have the gravest doubts, and which, I think, come the nearest to the line of all that I have before me, are these:

First. How far is it competent for the Legislature, in a case of this kind, to prescribe that the judicial tribunal can review manifestly arbitrary and unreasonable acts committed by the exercise of legislative discretion?

Mr. Musgrave said—now, let me get his expression—that it was an "abusive. arbitrary, and autocratic exercise of authority in denying to serve the public convenience of ten thousand clamoring people in the Hyattsville neighborhood."

Now, is not, possibly, the answer to that simply this? That if you have ten thousand clamoring citizens of this "Free State," and they are as outraged as your statement would indicate they are, that the *political* conscience of the Legislature would be very sensitive to that outraged community, and with you is the opportunity of your calling to its attention at the next session, the outrageous, arbitrary, and autocratic action of its legislative agents in this community, to which it had conferred discretion to act humanely and sympathetically for the public convenience?

And if you convince the Legislature of arbitrary and autocratic exercise of authority by its delegated agency, and if the Legislature is as responsive. as it always is, to that kind of a situation, it is certainly fair to assume that they would either call their agents to account, and either discharge them from their stewardship, or, better still, if the clamoring public is so widespread as you suggest, it can then pass a law, saying that it shall no longer be a matter for the exercise of delegated legislative *discretion*, and that wherever, in any community, one hundred voters petition for service to be supplied by a motor coach company, which is ready, and able, and willing to serve that community, that such applicant. shall, as a *matter of right*, be entitled to the issuance of a permit or franchise.

I think, then, you would have a "*matter of right*," after one hundred citizens had signed a petition, and if. after they had been refused their per-

mit, they then could come in before a judicial tribunal and say, We have the *right,* a right which we are asking to have enforced. It is a *right* because we come within the terms of the statute, which says, that upon the signature of one hundred people to a petition to a corporation, applying to serve that community, that the legislative commission shall act. And that would be a right that had then been acquired in the applicant. A statutory right. And if the Commission refused to honor that petition then, I think. that this Court could act and issue a mandamus, after ascertaining that the one hundred people had signed the petition and had come to the Commission and had been refused for that right of theirs would be a right that had been acquired by statutory grant.

I might say right here, gentlemen, that upon my early reading this morning, of the case which Mr. Edgett cited yesterday, the Connecticut case, in 43 Atlantic, 485, I was impressed that that was very close to the point.

I refer to the liquor license case where they said that the two things on which they based the issuance of the license were: The fitness of the person, and the fitness of the place. My impression was, and is, that the tribunal in this matter could view the question upon those two propositions. Now, assuming that these two qualifications existed and the Commission refused the license, did not the legal right to the permit exist, also? The last of the cases that Mr. Edgett read yesterday, the 78th Atlantic case, Norton Appeal, page 587, as to that, I think that a more careful reading of it will clearly distinguish it from any contention that it is an authority for the transfer of a legislative right to a legal or judicial power. There, the Court sustained the right of the Court to pass upon the question which, I think, involved property rights. The thing to be projected in that neighborhood was a railroad through some property without the location of it being fixed by plat or chart to be filed with the Public Service Commission, and the Court used the language somewhere, I think, that this complainant could invoke the Equity Court because no such plat had been filed, and for the further reason, that their legal right to property might be injured and invaded by the passage of this railroad. Therefore, it became a *legal* question,

as to whether property rights were to be invaded by the intrusion of a railroad without fair and adequate compensation. The case is there clearly distinguishable.

Now, whether this is a sound interpretation of that case, I cannot say, and I would say in conclusion, that there may be Connecticut authority to the contrary of the view which I hold in this matter, but my final interpretation of this Section 43 is, that it never was the intention of the Legislature to say, or to intimate, that Section 43 provided that if an applicant for a motor bus franchise applied to the Commission, there must be necessarily, a right of issuance.

As Mr. Marbury so well said, the whole trend of the times is to motor bus operation, both as to the carrying of passengers and freight. Railroad transportation is becoming rapidly a thing of the past. Public convenience must require a bus line in every section of the community, but it never could have been, in my judgment, the intention of the Legislature to burden the Equity Courts of Baltimore City, or the Circuit Courts of the Counties, with the swamped character of business which would necessarily result, if every application ever made by the vast army of motor bus transportation companies, endeavoring to meet the ever increasing demand of the increasing population of the rural and interurban developments, was entitled to judicial review of its application for franchise.

If so, then the minute that the bus line is refused its permit or franchise, for one reason or another, it would have a right to run into the courts. They could come into the Equity Court and bring in the whole neighborhood and take testimony for two weeks; as was suggested in this case, and we laid aside two weeks, the next two weeks, on the assurance that this case would take that long. And this is only one case. The counsel stated that it would take that long, but, assuming that we have overestimated the time—the time that both sides in this case considered would be necessary, two weeks, gentlemen, what would be the situation if all of those applicants could come into the Equity Court and have their evidence heard? Why, it would mean a long time being consumed in the taking of the evidence, the certifying of that evidence

to the Commission, and the refusal, perhaps, of the Commission to act and the sending of the matter back to the court again—it would be merely playing battledore and shuttlecock indefinitely.

And this tribunal could never order the issuance of the permit or franchise, or issue it itself. That would be unconstitutional. And so, if you concede that, you will, therefore, have to fall back upon its language and interpret its words: If any person should be aggrieved by the order of the Commission on the ground that it is unlawful or unreasonable "*as to any regulation, practice, act or service*," that they may have it reviewed in the Circuit Court.

Now, certainly, "regulation, practice, act, or service," can only by imagination be extended to include the *granting of a franchise!* and if the Legislature had in mind the supervision of its legislative agent, the checking of it up, and the safeguarding of its reasonable exercise of discretion, by giving the courts the power to review where it refuses a franchise it certainly would have *said so;* and it would have said that wherever any franchise is refused, that the party aggrieved by the refusal, may ask the court to review the action of the Public Service Commission and then that would become a question before the court. This view, I think, would make it unconstitutional, unless it gave every applicant a *right* to obtain it.

The bill which sets forth that the public service and the public convenience, and the widespread demand of the sections of Laurel, Prince George's, Upper Marlboro, and College Park, as far as the *pleadings* are concerned here, confessed for purpose of demurrer by the demurrer, would lead me to believe that the action of the Commission in this case was arbitrary, and was unreasonable, and was an improper exercise of its discretionary authority. That is, if I had had nothing to go by but the bill. But I cannot give to this section that interpretation, and include within the terms "service" and "act," by interpretation, the use of the word "denial" of franchise as being meant thereby. I do not think it was ever intended to cover that branch of the case. I think that where a franchise is denied, where the action is arbitrary, unreasonable, autocratic, biased, prejudicial, whatever you gentlemen care to term it, that the remedy for that is with the Legislature; that your people can call to its attention the high-handed manner in which the Commission is claimed to have denied all those "ten thousand clamoring constituents" of Mr. Musgrave's, of their rights as they regard them. I think that the Legislature can act and will act, if the facts warrant its action.

Now, in concluding this very informal decision, although it is being stenographed, there is one other matter that the Court would like to say with reference to this amendment that was made this morning. That is, how far the Court has a right to pass upon the question of the alleged arbitrary, or discriminatory action of the Public Service Commission in the exercise of its discretion, viz: Whether it can refuse the permit because the applicant is engaged in interstate commerce; whether that raises the question or a legal question upon which it would have a right to pass, I do not know. As Mr. Rawls said yesterday, even after his amplification of the atmosphere around this letter of the Commission—and I was still more impressed after hearing that, with the idea that, consciously, or unconsciously, the thing that actuated that Commission in the writing of that letter, was the fact that they were engaged in interstate commerce.

Now, whether I do them an injustice or not, I do not know, but that was my impression after hearing about the letter, and the introduction of the letter this morning, as an exhibit, certainly emphasizes the thought that that was very largely, if not exclusively, the actuating motive of the commission in refusing this application. Now, whether that gives the Complainant the right of an additional review, I say that I have my doubts. It is not so clear to me as to that.

For all of which reasons, I shall sustain that part of the answer treated as a demurrer, to the entire bill, and dismiss the bill.

(By Mr. Miles) Now, if Your Honor please, with respect to the Red Star case, we desire to dismiss that case so that we may proceed in another matter.

(By the Court) Well, dismissed without prejudice.

(Mr. Miles) Yes, sir.